This memorandum opinion is hereby adopted by the court as its findings of fact and conclusions of law.

**WESTCHESTER FIRE INSURANCE COMPANY, Plaintiff,**

**v.**

Joseph **TANTALO**, Margaret Tantalo, James Tantalo, Jacqueline Boisvert, Mrs. Angelina Boisvert, Robert Marlin, Jeannette E. Marlin, and Aristed Paulin, Administrator of the Estate of Ann Marie Broberg, also known as Ann Marie Paulin, Defendants.

Civ. No. 10533.

United States District Court
D. Connecticut.

Aug. 8, 1967.

George Muir and Stephen M. Riley, of Gordon, Muir & Fitzgerald, Hartford, Conn., for plaintiff.

Bernard H. Trager, Albert J. Kleban and Alexander W. Samor, of Trager, Kleban & Trager, Bridgeport, Conn., for Tantalo defendants.

Hugh C. Curran, E. Stanton Kennedy and Raymond C. Lyddy, of Curran, Kennedy & Lyddy, Bridgeport, Conn., for Boisvert defendants.

Harold Sobel, Bridgeport, Conn., for Marlin defendants.

Sidney Vogel, of Vogel, Sigsway, Seidman & Harris, Norwalk, Conn., for defendant Paulin.

TIMBERS, Chief Judge.

## QUESTION PRESENTED

The essential question presented in this diversity action for a declaratory judgment is whether a renewal automobile liability insurance policy claimed to have been issued by plaintiff to the Tantalo defendants was in force on May 6, 1964 when an automobile owned by Joseph and Margaret Tantalo and operated by their son, James Tantalo, collided with a tree in Trumbull, Connecticut, resulting in injuries to three of the other defendants who were passengers in the Tantalo automobile, as well as to James Tantalo.

After a two day trial, the Court holds that the policy in question was in force at the time of the accident. Accordingly, defendants are entitled to a judgment declaring that plaintiff must assume the defense of any claims against the Tantalo defendants arising from the accident and must pay any damages within the policy limits for which said Tantalo defendants may be adjudged liable.

The Court makes the following findings of fact and conclusions of law pursuant to Rule 52, Fed.R.Civ.P.

## FINDINGS OF FACT

*Jurisdiction*

▇▇▇ Jurisdiction is founded on diversity of citizenship and requisite jurisdictional amount.[1] Plaintiff Westchester Fire Insurance Company (hereinafter "the Company"), being a New York corporation and having its principal place of business in New York, is a citizen of that state. Defendants are Connecticut citizens. The amount in controversy, exclusive of interest and costs, exceeds $10,000.

*The Accident*

On May 6, 1964, at approximately 8:20 P.M., defendant James Tantalo, while operating a 1961 Pontiac automobile owned by his parents, Joseph and Margaret Tantalo, collided with a tree in Trumbull, Connecticut. Passengers in the automobile at the time of the accident were defendants Jacqueline Boisvert, Robert Marlin and Ann Marie Broberg, all of whom, as well as James Tantalo, were injured. Miss Broberg's injuries were fatal.

Actions have been brought and are now pending in the Superior Court for Fairfield County against the Tantalo defendants by each of the other defendants herein or their representatives to recover damages for personal injuries sustained in the accident of May 6, 1964.

The instant declaratory judgment action was commenced in this Court on July 2, 1964 by the Company to determine whether the renewal automobile liability insurance policy claimed to have been issued to the Tantalo defendants was in force at the time of the accident.

*Agent Guastella*

Determination of whether the renewal policy was in force at the time of the

---

1. 28 U.S.C. § 1332(a) (1).

While this Court is authorized by the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, to entertain an action for declaratory judgment, such statute does not furnish an independent basis of federal jurisdiction. The Declaratory Judgment Act is not a jurisdictional statute; it serves only to extend the range of remedies available in the federal courts if jurisdiction over the parties and subject matter otherwise exists. The declaratory claimant, like the ordinary plaintiff in a federal court, must show (1) that the required jurisdictional amount is present, and (2) either (a) that there is diversity of citizenship or (b) that the complaint presents a substantial federal ques-

tion. See Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671–672 (1950); 6A Moore's Federal Practice ¶57.23, at 3136 (2d ed. 1966).

In the instant declaratory judgment action, there is diversity of citizenship; and the value of the "matter in controversy", measured not by the monetary result of determining the principle involved but by its pecuniary consequence to those involved in the litigation, clearly is in excess of the requisite jurisdictional amount. Thomson v. Gaskill, 315 U.S. 442, 447 (1942); Wheless v. St. Louis, 180 U.S. 379, 382 (1901); Masterson v. Atherton, 223 F.Supp. 407, 409 (D.Conn. 1963) (declaratory judgment action).

accident turns heavily upon the status of Emanuel J. Guastella (hereinafter "the Agent") in his relationship to the Company and his conduct with respect to the renewal policy.

Guastella operates a general insurance agency in Stratford, Connecticut. He has been an agent of the plaintiff Company for eleven years. During 1963 and 1964 Guastella had a written "AGENCY AGREEMENT" with the Westchester Fire Insurance Company dated May 1, 1962 (Defendants' Ex. D). This agreement gave him broad powers as the Agent of the Company. Among the powers granted to him as Agent was the authority "to receive *and accept* proposals for insurance covering certain classes of Casualty risks." (Emphasis added) Among the classes of risks to which the Agent was authorized to bind the Company was "Automobile Bodily Injury Liability", upon which the agreement provided for the Agent to retain 20% of the premiums as his commission. In addition to the Agent's premium percentage commissions, there also was provision for the Agent to receive "a percentage share of the underwriting profits . . . realized by the Company on all business written by or through the Agency for the Company" in accordance with a formula and profit table set forth in a "Profit Sharing Agreement" executed by the Company and the Agent simultaneously with the Agency Agreement (Defendants' Ex. D).

It would be difficult to conceive of an agency relationship which more clearly established Guastella as the agent of the plaintiff Company fully authorized to bind the Company in issuing automobile liability insurance policies during the relevant period here involved. Indeed, at the trial plaintiff's counsel frankly conceded that during 1963 and 1964 Guastella was a fully authorized agent of the plaintiff Company.

*Issuance of the April 12, 1963–April 12, 1964 Policy (No. FCA 128412)*

Although Guastella had sold a home owner's policy to Joseph Tantalo in February 1963, the first automobile liability insurance policy was sold by Guastella to Tantalo on April 12, 1963. This policy (Defendants' Ex. E), issued by the plaintiff Company to Joseph and Margaret Tantalo and designated as policy number FCA 128412, covered their 1961 Pontiac for the one year period from April 12, 1963 to April 12, 1964.

Although ordered by Tantalo from Guastella on April 12, 1963 and issued by the Company on that date, Tantalo's copy of the policy was not delivered to him by Guastella until almost a month later, on May 7, 1963—a common practice. The original of the policy went to the finance company; duplicate copies were retained by the plaintiff Company and by Guastella.

The plaintiff Company looked to Guastella as its agent for payment of the premium on the policy; the Company was not concerned with whether the Tantalos paid the premium to Guastella, much less with the arrangements between the Tantalos and Guastella for payment of the premium. In practice, Guastella extended credit to the Tantalos with respect to the payment of premiums on the insurance policies purchased by them from his agency. For example, the premium on the home owner's policy purchased by the Tantalos in February 1963 was $103.72; the premium on the automobile liability insurance policy purchased on April 12, 1963 was $145.90. By check drawn August 15, 1963 and marked "for auto and property insur." (Defendants' Ex. F), Tantalo paid Guastella $100; and by check drawn November 30, 1963 and marked "bal. auto insur." (Defendants' Ex. G), Tantalo paid Guastella $103.72. Tantalo appears to have had an open account with Guastella for the payment of premiums on his various policies; lump sum payments by Tantalo were applied to the premiums on his policies as Guastella saw fit.

■ From the standpoint of the issues in the instant case, the critical fact is that the effectiveness of the automobile liability insurance policies issued by the Company to the Tantalos was not contingent upon actual payment of the pre-

miums by the Tantalos. Consideration for the Company's agreement to insure was the insured's executory promise to pay premiums, not the actual payment thereof. And the Company looked to its agent Guastella, not to the Tantalos, for payment of the premiums.

*Additional Car and Driver Endorsements of February 1964*

Around the middle of February 1964, at the request of Joseph Tantalo, Guastella agreed that the automobile liability insurance policy then in effect (No. FCA 128412) would be endorsed to cover a second automobile owned by the Tantalos, a 1958 Olds; and also to cover an additional driver, James Tantalo, son of Joseph and Margaret Tantalo.

The endorsement to cover the additional driver is reflected in Guastella's bill of February 20, 1964 to the Tantalos for an additional premium of $34.12 (Defendants' Ex. C); [2] the endorsement to cover the additional car is reflected in the "Change of Automobile Endorsement" effective February 25, 1964 and indicating an additional premium of $16.73.

Although these endorsements were effective in February, they were not actually sent by the plaintiff Company to Guastella and delivered by him to the Tantalos until almost two months later; the endorsements were received by Guastella from the Company on April 21, 1964 and on the same date were mailed by him to the Tantalos.[3]

*Issuance of the April 12, 1964–April 12 1965 Renewal Policy (No. FCA 391902)*

At the time of the conversation between Joseph Tantalo and Guastella in February 1964 about adding James Tantalo and the 1958 Olds to the policy then in effect, Joseph Tantalo specifically inquired whether his son James would be included when the policy was renewed in April. Guastella assured Tantalo that his son would be covered by endorsement under the existing policy from February until April and that he would be included in the renewal policy in April. Guastella said that the additional premium of $34.12 for the additional driver endorsement would be added to the renewal premium. Tantalo told Guastella that he wanted to be absolutely certain of his son's coverage under the policy in effect in February 1964 as well as under the renewal policy. Guastella said, "Leave it to me." Tantalo thereafter did not contact any other insurance agents regarding his son's coverage or the renewal of his automobile liability insurance policy, and made no other arrangements with respect to these matters, relying upon Guastella's assurances.

On or about March 12, 1964—approximately one month before the expiration of policy number FCA 128412—the plaintiff Company sent to its agent Guastella renewal policy number FCA 391902 (Defendants' Exs. I and R) to be issued to Joseph and Margaret Tantalo covering their 1961 Pontiac for the period from April 12, 1964 to April 12, 1965. This renewal policy in all material respects provided the same coverage as the original policy except that the renewal policy's rate class was 1A–O (applicable to one or more unmarried male operators under 25 years of age) rather than class 1B–O which was the rate class of the original policy prior to the additional driver endorsement. In short, the renewal policy covered the Tantalos' 1961 Pontiac and included coverage for its operation by their son James; the premium on the renewal policy was $218.80.[4]

Renewal policy number FCA 391902 shows on its face that it was "issued"

---

2. This bill refers to the *"Renewal Date"* of policy number FCA 128412 as "4–12–64".

3. This was nine days after policy number FCA 128412, to which the endorsements applied, would have expired unless it had been renewed.

4. Tantalo's proposal in February 1964 to renew the policy, which was accepted by Guastella on behalf of the Company, also included coverage for the 1958 Olds; to correct this omission from the renewal policy as originally issued, Guastella wrote to the Company on April 17, 1964 (Defendants' Ex. J), as mentioned below.

March 24, 1964; that it was issued in "renewal or replacement" of policy number FCA 128412; and that it was countersigned by Guastella as "authorized representative" of the plaintiff Company (Defendants' Ex. R.).[5]

On April 17, 1964 Guastella wrote to the plaintiff Company with reference to renewal policy number FCA 391902; he requested the Company to expedite including coverage for the 1958 Olds in the renewal policy and to endorse the policy to two installments, the latter to facilitate payment of premiums (Defendants' Ex. J).

On April 20, 1964 the plaintiff Company wrote a letter (Defendants' Ex. K) to Gaustella captioned as follows:

"FCA 391902

INSURED: JOSEPH & MARGARET PANTALO [sic]
EFFECTIVE: 4/12/64"

The writer expressed regret at not getting out to Guastella the requested endorsement to include the 1958 Olds; advised that the Company had learned that the insureds' 16 year old son James had 100% use of the Olds which he was driving to and from school daily; and stated that "we would not like to write this car on the renewal policy and we would appreciate your relieving us of the liability on this car and have an exclusion endorsement issued for the son." Guastella received this letter two or three days after April 20, 1964.

At no time prior to the accident of May 6, 1964 were the Tantalos notified

by either Guastella or the plaintiff Company of the latter's desire to be relieved of liability on the 1958 Olds and to have James Tantalo excluded from coverage under the renewal policy which had been in effect since April 12, 1964.

*Events of May 6, 1964*

For Emanuel J. Guastella, May 6, 1964 was an extraordinarily busy day.

The accident which gave rise to the instant lawsuit occurred at 8:20 P. M. that night. Guastella first heard about it on the radio. He immediately consulted his personal attorney who strongly advised him to report the accident to the plaintiff Company. Guastella did so; he filled out and mailed to the Company its form of "Automobile Accident Or Loss Notice" (Defendants' Ex. L), describing Joseph and Margaret Tantalo as the "Insured" and listing the three passengers and driver in the "Insured's Car", the 1961 Pontiac, as the persons injured.

Earlier that day—i. e. *May 6, 1964, the day of the accident*—Guastella, according to his testimony, had busied himself taking care of the following matters:

(i) He sent to the plaintiff Company the original renewal policy number FCA 391902, countersigned by Guastella (Defendants' Ex. R), under cover of his memorandum dated May 6, 1964 reading, "Enclosed please find policy on the above captioned. Cancelled—nonpayment. Thank you." (Defendants' Ex. N).[6]

---

5. Every good case requires a mystery document. In the instant case, Defendants' Ex. R is it. Despite the thorough pretrial discovery proceedings and the meticulous examination of documents at the trial, Exhibit R did not put in its appearance until several days after conclusion of the trial. During a checking of trial exhibits in the Clerk's office by counsel, the document (later marked Defendants' Ex. R by stipulation of all counsel) inadvertently was discovered to be among the papers in the possession of plaintiff's counsel. All counsel agree, and the Court concurs, that its non-production during discovery proceedings and at

the trial was inadvertent and affords no basis for criticism of plaintiff's counsel. Its chief significance is that it establishes that the original of renewal policy number FCA 391902 had been countersigned by Guastella as authorized representative of the plaintiff Company after its issuance on March 24, 1964. At the trial Guastella denied that he had ever countersigned the renewal policy.

6. According to a rubber stamp mark on Defendants' Ex. R, it appears that the original renewal policy was received in plaintiff's New York office on May 8, 1964.

(ii) He sent to the finance company (Universal C.I.T.) a memorandum dated May 6, 1964 reading, "Joseph & Margaret Tantalo's automobile coverage has ceased as of April 14, 1964. Thank you." (Defendants' Ex. M).

(iii) He sent to Joseph Tantalo a memorandum dated May 6, 1964 reading in part, "The Insurance Company has found out that your son is using the car to and from school, which means he goes under a higher rate, also the balance on last years insurance has not been paid to me as you promised, so I am asking you to make other arrangements with another company for your coverage." (Defendants' Ex. A).[7]

(iv) He wrote across the face of his retained copy (also referred to as the agent's daily copy) of renewal policy number FCA 391902 the words "Cancelled Flat N.P." (Defendants' Ex. I); according to Guastella, this meant that the policy had been cancelled for nonpayment of premiums and no one was required to pay anything—neither Tantalo nor Guastella.[8]

*Events Subsequent To May 6, 1964*

Under date of May 7, 1964—*the day after the accident*—the Company sent to its Agent Guastella the following four endorsements (Defendants' Ex. O), each dated "5/7/64", each stated to be "effective 4/12/64" and each stated to form "a part of policy No. FCA 391902":

(i) "Exclusion Of Named Driver" endorsement, purporting to exclude James Tantalo as an operator of any automobile covered by the policy.

(ii) "General Purpose Endorsement", purporting to return $35.30 in premiums as a result of excluding James Tantalo as a named driver.

---

7. Guastella testified that he *dictated* his memorandum of May 6, 1964 to Tantalo (Defendants' Ex. A) at about 10:30 A.M. that day and sent it by regular mail. Tantalo testified that he received it *two or three days after the accident.*

As reflecting on Guastella's credibility, it is noteworthy that he gave conflicting versions in his various memoranda of May 6, 1964 as to the status of the Tantalos' renewal policy and the reasons for his action with respect thereto: in his memorandum to the finance company, he said the Tantalos' automobile coverage "has ceased as of April 14, 1964" (Defendants' Ex. M); in his memorandum to the plaintiff Company, he said the Tantalo policy was cancelled for nonpayment of premiums (Defendants' Ex. N); and in his memorandum to Tantalo, he asked him "to make other arrangements with another company for your coverage" because the Company had discovered his son was using the car to drive to and from school and because of his delay in paying premiums (Defendants' Ex. A).

At the trial Guastella gave conflicting testimony as to whether he decided to cancel the Tantalo policy on May 6, 1964 or prior to April 12, 1964; and he admitted that he had been less than candid in assigning different reasons to different persons for such action as he did take.

Under any version of Guastella's testimony, however, it is undisputed that he did not get notice to Tantalo until after the accident that either Guastella or the Company had any desire to cancel the policy or to exclude James from coverage.

8. Defendants have requested a finding that premiums for the policy in fact had been paid in full. While there is evidence which would tend to support such a finding (Defendants' Exs. F and G show that, whereas the premium on policy number FCA 128412 was $145.90, a total of $203.72 had been paid by checks earmarked for automobile insurance), the Court is reluctant to so find, for the reason that such a finding would not be based upon the clear preponderance of the credible evidence as is believed to support the other findings herein. Moreover, as stated above (pp. 10–11, supra), consideration for the Company's agreement to insure was the insured's promise to pay premiums, not the actual payment thereof. And, so far as the effectiveness of the coverage on May 6, 1964 is concerned, payment or nonpayment of the premiums is irrelevant, since the plaintiff Company was in no way concerned with arrangements between Guastella and the Tantalos for payment of premiums; the Company looked to its agent Guastella, not to the Tantalos, for payment of premiums.

(iii) "Installment Payment Of Premium Endorsement", purporting to make the total premiums of $219.-80 on the policy payable in two installments due April 12, 1964 and August 12, 1964, respectively.

(iv) "Installment Payment Of Premium Endorsement", purporting to make the return premiums of $35.30 payable in two installments, also due April 12, 1964 and August 12, 1964, respectively.

Guastella received these four endorsements from the Company on May 8 or 9, 1964. They were never signed by either Guastella or the Tantalos; and for aught that appears in the record they were never even submitted to the Tantalos.[9]

*Understanding Of The Parties With Respect To The Status Of Renewal Policy No. FCA 391902 As Of The Date Of The Accident*

From February 1964, when Joseph Tantalo specifically requested and received from Guastella assurances that his son James would be covered by the renewal policy in April, to the time of the accident on May 6, 1964, the Tantalos received no communication, either written or oral, from the Company or from Guastella that their automobile liability insurance policy would not be, or had not been, renewed; or that their son James would not be, or had not been, included in the coverage of the renewal policy.

As of the time of the accident on May 6, 1964, the Tantalos and the Company understood the renewal policy to be in force and James Tantalo to be included

in the coverage afforded by the renewal policy. Even accepting as true Guastella's questionable testimony as to his activities on May 6, 1964 (pp. 12, – 13, supra), Guastella prior to the accident did not notify either the Tantalos or the Company of his intention to cancel the policy or to exclude James Tantalo from coverage thereunder.

*Custom And Practice Of Renewing Automobile Liability Insurance Policies*

There was uncontroverted testimony that in the area of Bridgeport, Connecticut (the place where all the essential acts with respect to the making and performance of the insurance contract here in question took place) it was the custom and practice for the insurer to renew annually an automobile liability insurance policy without a specific request for renewal by the insured. Joseph Tantalo, who at the time of the trial was and for 17 years prior thereto had been an agent for the Prudential Life Insurance Company, testified that he knew this to be the custom and practice in the area; that his automobile liability policy had been automatically renewed without his requesting it by the agency with which he had carried his policy for 10 years before he first took out a policy with Guastella; and that he assumed such custom and practice would be followed by Guastella when he took out his first automobile liability policy with Guastella in April 1963 and again in February 1964 when he discussed the coverage of his son in connection with the renewal of the policy.[10]

---

9. Each of these endorsements has a line for signature by an "Authorized Representative" or "Authorized Agent"; each such signature line is blank. The "Exclusion Of Named Driver" endorsement has an acceptance line for signature by the "Named Insured and/or Spouse"; this line is blank. The "General Purpose Endorsement" states, immediately over the line for signature by an authorized agent, "Not valid until countersigned by an authorized agent of the Company"; there is no such countersignature.
Guastella testified at the trial that each of these endorsements was to be signed

by Tantalo and by himself, but none was signed by either.

10. Under Connecticut law, evidence of custom and practice with respect to renewal of insurance contracts is admissible. Dresser & Son, Inc. v. Insurance Companies, 101 Conn. 626, 639–643, 126 Atl. 912, 916–918 (1924). And the custom here shown of annual renewal of automobile liability insurance policies without a specific request for renewal by the insured is so well established in this state that the Court might appropriately take judicial notice of it. Under the view

## CONCLUSIONS OF LAW

(1) The Court has jurisdiction over the parties to and the subject matter of this action.

(2) Connecticut substantive law governs the validity and construction of the insurance contract here involved.

(3) Guastella was a fully authorized agent of the plaintiff Company and was specifically authorized to bind the Company by accepting on its behalf offers or proposals for coverage of automobile bodily injury liability risks.

(4) During February 1964, Joseph Tantalo made an offer or proposal to purchase from the plaintiff Company through its agent Guastella a renewal automobile liability insurance policy, specifically a renewal for one year of plaintiff's policy number FCA 128412 then in force and due to expire April 12, 1964.

(5) Guastella as agent of the plaintiff Company accepted said offer or proposal of Joseph Tantalo.

(6) The plaintiff Company on March 24, 1964 issued its renewal automobile liability insurance policy number FCA 391902 to Joseph and Margaret Tantalo for the period April 12, 1964 to April 12, 1965; said renewal policy was countersigned by Guastella as authorized representative of the plaintiff Company; and said renewal policy provided the same coverage as policy number FCA 128412 had provided from February to April of 1964, including coverage of the Tantalos' 1961 Pontiac and 1958 Olds and their operation by their son, James Tantalo.

(7) The said renewal policy number FCA 391902 was in force at the time of the accident on May 6, 1964 when the 1961 Pontiac automobile owned by defendants Joseph and Margaret Tantalo and operated by their son, defendant James Tantalo, collided with a tree in Trumbull, Connecticut, resulting in in-

juries to the defendant passengers Jacqueline Boisvert, Robert Marlin and Ann Marie Broberg, as well as to defendant James Tantalo.

(8) Prior to the said accident of May 6, 1964, the said renewal policy number FCA 391902 was not cancelled, nor was defendant James Tantalo excluded from coverage thereunder.

(9) In the alternative, the plaintiff Company is estopped to deny that renewal policy number FCA 391902 was in force at the time of the accident on May 6, 1964 or that defendant James Tantalo was covered thereunder.

(10) Defendants are entitled to a judgment declaring that the plaintiff Company must assume the defense of any and all claims against the Tantalo defendants arising from the said accident of May 6, 1964; that the plaintiff Company must pay any damages within the policy limits for which the Tantalo defendants may be adjudged liable; and that defendants shall recover from the plaintiff Company their costs in the instant declaratory judgment action.

## OPINION

### The Facts

The facts necessary to a determination of the issues in this case for the most part are undisputed. The testimony adduced at the trial was based largely upon documents which were marked as exhibits.

Two areas of testimony, however, are worthy of brief comment: Guastella's testimony regarding his activities on May 6, 1964, the day of the accident; and the testimony of Joseph Tantalo and Guastella regarding their February 1964 conference.

As indicated above (pp. 12, – 13 and note 7, supra), even assuming the truth of Guastella's testimony regarding his activities on May 6, 1964, it is conflicting as to the reasons he gave to the finance

---

taken by the Court of the law applicable to the facts of the instant case, however, neither evidence nor judicial notice of such custom and practice is necessary;

and the Court has not relied on such custom and practice in reaching its decision.

company, to the plaintiff Company and to Tantalo for his unilateral action in purporting to cancel the policy; and it is conflicting even as to his understanding with respect to the status of the policy.[11] Moreover, the documents prepared by him that day, according to his testimony, nail down the self-contradictory character of his testimony as to these matters (Defendants' Exs. A, L, M and N). Since the legal relations between the parties were not affected by Guastella's activities on May 6, 1964 nor by his understanding as to the status of the policy, the chief significance of his testimony on these matters is its bearing upon his credibility. The Court has serious misgivings as to Guastella's credibility.

 The testimony of Joseph Tantalo and Guastella regarding their February 1964 conference is critical upon the issue of whether Tantalo made an offer or proposal to purchase a renewal policy, specifically to include Tantalo's son James as a covered driver, and whether Guastella accepted Tantalo's offer or proposal. This testimony has been summarized above (p. 11, supra). In weighing the testimony of Tantalo and Guastella on this critical issue, the Court has applied the accepted tests of credibility,[12] including the demeanor of the respective witnesses on the stand; their interest in the outcome of the case; the inherent probability and consistency of their testimony; and its corroboration or lack of corroboration with other credible evidence such as the documentary exhibits. Applying these tests, the Court credits Tantalo's testimony and finds it persuasive in establishing that he did in fact make an offer or proposal to Guastella in February 1964 to purchase a renewal policy specifically to include his son as a covered driver, and that Guastella in fact accepted Tantalo's offer or proposal. To the extent that Guastella's testimony is inconsistent with that of Tantalo on this issue, the Court finds Guastella's testimony lacking in credibility. But it should be noted that at no time during the trial did Guastella categorically deny the critical testimony of Tantalo regarding their February 1964 conversation about renewing the policy; Guastella simply said that he could not recall whether the discussion concerning the renewal policy took place over the phone or at Guastella's office.

*The Law*

Applying well settled principles of agency and contract law to the facts as found, the conclusions of law set forth above are believed to follow without the necessity for extensive elaboration.

 This being a diversity case, under the *Erie* rule [13] this Court must follow Connecticut conflict of laws rules.[14] In Connecticut the validity and construction of a contract are determined by the law of the place where the contract was made; but if the contract is to have its operative effect or place of performance in a jurisdiction other than

---

11. For example, at the trial, in response to questions by the Court, Guastella testified flatly that the renewal policy was in effect on April 21, 1964 when the Company sent him the endorsement (Defendants' Ex. H) adding the 1958 Olds to policy number FCA 128412; a moment or two later, in response to questions by plaintiff's counsel, he testified that the renewal policy never became effective because he never countersigned it (Transcript of Guastella's testimony on March 23, 1967, pp. 4–10). When the original of the renewal policy later was produced by plaintiff's counsel, it was established that it had in fact been countersigned by Guastella and he so admitted in his post-trial affidavit of March 29, 1967 (Defendants' Ex. R; see note 5, supra).

12. See Lomartira v. American Automobile Insurance Company, 245 F.Supp. 124, 131 (D.Conn.1965), aff'd, 371 F.2d 550 (2 Cir. 1967); Locke Manufacturing Companies v. United States, 237 F.Supp. 80, 89 (D.Conn.1964); Pickett v. Nelseco Navigation Company, 270 F.Supp. 682, 683 (D.Conn.1967); United States v. Feudale, 271 F.Supp. 115, 119 (D.Conn. 1967); Rosner v. Modern Maid Packers, Inc., Civ. No. 9228, D.Conn., Aug. 2, 1967.

13. Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938).

14. Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487 (1941).

the place where it was entered into, Connecticut looks to the law of the place of operative effect or performance to determine its validity and construction.[15] Since all essential acts with respect to the making of the insurance contract here involved took place in Connecticut (which also was the state of contemplated performance), clearly Connecticut substantive law governs its validity and effect.

By express written agreement, Guastella was the agent of the plaintiff Company and was fully authorized to bind the Company by accepting on its behalf offers or proposals for coverage of automobile bodily injury liability risks.[16]

The conversation between Tantalo and Guastella in February 1964 and the events which followed with respect to the issuance of the renewal policy are susceptible of a variety of descriptions in terms of legal concepts. The essential facts, however, are simple. Tantalo made it clear in February that he wanted to add his son and his 1958 Olds to the existing policy and that he wanted both to be included in the renewal policy in April; he particularly emphasized that he wanted to be "absolutely certain" that his son was covered under the existing policy as well as under the renewal policy. Guastella said, "Leave it to me"; he assured Tantalo that his son and the second car would be covered by endorsement under the existing policy and that both would be included in the renewal policy in April; he added that the extra premium for the additional driver endorsement would be included in the renewal premium. Subsequent conduct by Guastella and the Company with respect to issuance of the endorsements and the renewal policy, and by Tantalo in forbearing from making any other arrangements for his automobile liability coverage, confirm the meeting of the minds in February.

 Even though the policy in effect in February had no renewal provision, the oral agreement to renew was not required to be as definite as to terms as the agreement to issue the original policy, since the renewal agreement is presumed to adopt and have reference to the terms of the existing or expiring policy.[17] Had Tantalo and Guastella been lawyers, more precise language of offer and acceptance might have been expected at the February conference. It must be remembered, however, that each was an insurance agent. Guastella had been an agent for the plaintiff Company for 11 years. Tantalo had been an agent for the Prudential for 17 years. Their conversation was in the language of the insurance market place. When Tantalo said he wanted to be "absolutely certain" of having his son and second car "covered" under the existing and renewal policies, and when Guastella replied, "Leave it to me", each knew what the other meant.

 Under all the circumstances, the Court holds that in February 1964 Tantalo made an offer or proposal to Guastella to purchase from the plaintiff Company a renewal policy similar in terms to the policy then in force but, in addition, specifically to include his son and the second car;[18] that Guastella as agent of the plaintiff Company accepted Tantalo's offer or proposal;[19] that the

15. Breen v. Aetna Casualty & Surety Co., 153 Conn. 633, 637, 220 A.2d 254, 256–257 (1966); Jenkins v. Indemnity Ins. Co., 152 Conn. 249, 252, 205 A.2d 780, 782 (1964).

16. Defendants' Ex. D; see Norwalk Tire & Rubber Co. v. Manufacturers' Casualty Ins. Co., 109 Conn. 609, 613, 145 Atl. 44, 46 (1929); Dresser & Son, Inc. v. Insurance Companies, 101 Conn. 626, 641–643, 126 Atl. 912, 917–918 (1924); Restatement (Second), Agency §§ 1, 3, 7 (1957).

17. Massachusetts Bonding & Ins. Co. v. R. E. Parsons Electric Co., 61 F.2d 264, 268, 92 A.L.R. 218, 220 (8 Cir. 1932); 29 Am.Jur. Insurance § 359 (1960).

18. 1 Corbin, Contracts § 11 (1963); Restatement, Contracts § 22 (1932).

19. Shulman v. Hartford Public Library, 119 Conn. 428, 433, 177 Atl. 269, 271 (1935); Maltby, Inc. v. Associated Realty Co., 114 Conn. 283, 288, 158 Atl. 548, 550 (1932); Raff Co. v. Murphy, 110 Conn. 234, 239, 147 Atl. 709, 711 (1929);

consideration for the Company's promise to issue the renewal policy was Tantalo's promise to pay premiums, together with his forbearance from making any other arrangements for his automobile liability coverage; [20] that the plaintiff Company thereafter did issue the renewal policy for the one year period beginning April 12, 1964, providing the same coverage as the previous policy and specifically including James Tantalo and both of the Tantalo cars; [21] that the renewal policy was countersigned by Guastella as the authorized agent of the plaintiff Company; [22] that the renewal policy was in force at the time of the accident of May 6, 1964, there having been no effective cancellation of the policy or exclusion of James Tantalo from coverage thereunder; [23] and that, in the alternative, the plaintiff Company is estopped to deny that the renewal policy was in force at the time of the accident or that James Tantalo was covered thereunder.[24]

## ORDER

(1) The Clerk is directed to enter judgment as follows:

(a) That plaintiff's renewal policy number FCA 391902 was in force at the time of the accident on May 6, 1964 and covered defendant James Tantalo's operation of the 1961 Pontiac automobile owned by defendants Joseph and Margaret Tantalo.

(b) That plaintiff must assume the defense of any and all claims against

the Tantalo defendants arising from said accident.

(c) That plaintiff must pay any damages within the policy limits for which the Tantalo defendants may be adjudged liable arising from said accident.

(d) That defendants shall recover from plaintiff their costs in the instant declaratory judgment action.

(2) Plaintiff's post-trial motion to strike evidence, filed April 6, 1967, alleging that "all the evidence offered by the defendants is inadmissible", is denied.

---

1 Corbin, *op. cit. supra* note 18, § 55; Restatement, Contracts, *op. cit. supra* note 18, §§ 19, 20, 21.

20. Massachusetts Bonding & Ins. Co. v. R. E. Parsons Electric Co., supra note 17, at 268–269; 1 Corbin, *op. cit. supra* note 18, § 142; Restatement, Contracts, *op. cit. supra* note 18, §§ 75, 90; 29 Am.Jur. Insurance, *op. cit. supra note* 17, § 359.

21. Defendants' Exs. I and R; see pp. 11–12, supra.

22. Defendants' Ex. R; see p. 12 and note 5, supra; and see "Witness" clause on p. 5 of Defendants' Ex. E, reading in part, " * * * this policy shall not be valid unless * * * countersigned on the aforesaid declarations page by a duly

authorized representative of the company". That is precisely what Guastella did on the renewal policy, Defendants' Ex. R.

23. There was no attempt whatsoever to comply with the cancellation clause of the policy. See Condition No. 16 on p. 5 of Defendants' Ex. E. The Company at no time attempted to cancel the renewal policy itself; and of course its efforts after the accident to exclude James Tantalo from coverage were wholly abortive so far as the issues in the instant case are concerned. See pp. 13–15, supra.

24. Breen v. Aetna Casualty & Surety Co., 153 Conn. 633, 643, 220 A.2d 254, 259 (1966); cf. Shinabarger v. United Aircraft Corp., 381 F.2d 808 (2 Cir. 1967).